IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIERDRA WRIGHT,<br><br>        Plaintiff,<br><br>   v.<br><br>SHORE MEMORIAL HOSPITAL, et al.,<br><br>        Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Civil No. 11-5583 (JBS/AMD)<br><br><br>**OPINION** |

APPEARANCES:

Jeremy M. Cerutti, Esq.
Ari R. Karpf, Esq.
Christine Elaine Burke, Esq.
Paul Calvin Lantis, Esq.
KARPF, KARPF & CERUTTI, P.C.
3331 Street Road, Suite 128
Two Greenwood Square
Bensalem, PA 19020
    Counsel for Plaintiff

Julie Holland Kinkopf, Esq.
Richard J. De Fortuna, Esq.
PAISNER LITVIN LLC
30 Rock Hill Road
Bala Cynwyd, PA 19004
    Counsel for Defendant

**SIMANDLE,** Chief Judge:

## I.   INTRODUCTION

Plaintiff Deirdra Wright alleges that her employer,
Defendant Shore Memorial Hospital ("SMH"), interfered with her
rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§
2601, et seq., and ultimately fired her in violation of that
statute and the New Jersey Law Against Discrimination ("NJLAD"),

N.J.S.A. § 10:5-2.1, et seq. Defendants SMH and Edward Quigley, Plaintiff's supervisor, contend that Plaintiff was terminated because she was demeaning and disrespectful to a patient, which Defendants characterized as "gross misconduct." Before the Court is Defendants' motion for summary judgment. [Docket Item 25.]

The key inquiries for the Court are (1) whether there is evidence that Plaintiff suffered prejudice as a result of Defendants' alleged interference, (2) whether there is evidence from which a jury could reasonably find that Plaintiff has met her burden to show that Defendants' proffered reason for her termination was pretextual, and (3) whether Plaintiff has established a prima facie case of age or disability discrimination. For the reasons explained below, the Court will grant Defendants' motion for summary judgment.

## II. Background

Plaintiff Wright worked as a registrar in the Patient Access Department of SMH from 2002 until May 10, 2011. (Def. Statement of Material Facts ("SMF") [Docket Item 26] ¶ 2-3.) Registrars register patients, assist patients and hospital staff in other ways, and are often the first point of contact patients have with the hospital. (Id. ¶ 11; Pl. Ex. D.) On May 29, 2009, Plaintiff sustained injuries to her back and eye in a motor vehicle accident. (SMF ¶ 69; Pl. Counter-Statement of Undisputed Facts ("CSF") [Docket Item 31] ¶ 35.) Over the course of the following

two years, up until her termination, Plaintiff requested several different medical leaves of absence related to her injuries and a change in work schedule, which were granted. (Wright Dep. at 140:20-141:6.) On May 10, 2011, she was terminated, purportedly for making insensitive remarks to a patient, identified in the motion briefs as C.W., who complained about Plaintiff to SMH. Plaintiff disputes the substance of C.W.'s allegations against her, and asserts that SMH's investigation into the incident was incomplete and her termination was pretextual.

## A. Plaintiff's medical leave history

Plaintiff first requested intermittent leave[1] from October 27, 2009, through January 1, 2010, to attend doctor's appointments arising from her accident. (Id. ¶ 81; Def. Ex. U.) SMH granted Plaintiff's request on November 3, 2009, and told Plaintiff that she must submit a doctor's note to the human resources department for each work day she missed under the intermittent leave. (SMF ¶¶ 81-82.)

Plaintiff submitted a second request immediately thereafter, on November 4, 2009, for leave related to "blaspharospasm treatment," noting that "treatment is every 3 months," beginning on "12/3/09." (Def. Ex. V.) The request was approved, with the notation that "Intermittent LOA [leave of absence] ends 1 year

---

[1]     Intermittent leave may be taken when "medically necessary" and when the timing of needed medical treatment is unpredictable. See 29 C.F.R. § 825.302(f); 29 U.S.C. § 2612(b).

from the start of first int. LOA." (<u>Id.</u>)

Plaintiff submitted another request on November 9, 2009, for a specific procedure that was scheduled for November 20 through November 22, 2009. (Def. Ex. W.) The request was granted. (<u>Id.</u>) Plaintiff experienced complications with her treatment and needed more time off. (Wright Dep. at 160:5-13.) She testified that she got the impression that Edward Quigley, her manager, was about to, or wanted to, "write me up, but he didn't" and that Quigley told her that "you're supposed to be here. Like, you can't leave. You can't go to this appointment." (<u>Id.</u> at 160:6-9; 162:3-11.) Plaintiff further testified that she went over Quigley's head to get permission for additional time off from another supervisor, "Kelly." (<u>Id.</u> 162:7-11.) Plaintiff was told she needed to obtain additional doctors' notes to justify any time off that had not been included in the November 9 leave request, which she did, and Plaintiff testified that there was no "interference" with the leave between November 20 and 22, 2009, and no problems once she obtained doctors notes. (<u>Id.</u> at 161:7-17.)

Plaintiff submitted two more requests on March 31, 2010: one for intermittent leave from April 15, 2010, through July 15, 2010, for treatment with Dr. Zied (Def. Ex. X; SMF ¶ 92), and the other for intermittent leave from April 1, 2010, through October 1, 2010, for evaluations every six months at Temple Lung Center (Def. Ex. Y; SMF ¶ 94). The requests were granted. (Def. Exs. X &

Y.)

Plaintiff alleges that on June 5, 2009, Mr. Quigley wrote down notes summarizing a discussion he had with Plaintiff. (Pl. Ex. T.) The note is unsigned and does not give any indication of authorship. (Id.) Quigley testified that he did not recognize the note, that he did not know who had drafted it and that he could not recall a discussion with Plaintiff about changes in her shift.[2] (Quigley Dep. at 74:14-75:1.) The note summarizes a discussion about Plaintiff's shifts, and then adds that Plaintiff

> stated that she had to leave work at 4pm to make a series of doctor's appointment [sic] starting this coming Monday. I was disappointed that this was not more of a request than a statement of what she needed to have happen but we agreed that she could leave early and not take lunch.

(Pl. Ex. T.)

On June 25, 2010, Plaintiff submitted a request for reduced schedule leave, which permitted her to work Monday, Wednesday and Friday beginning June 28, 2010 through September 28, 2010. (Def. Ex. Z.) The request was granted, and Kathleen Nunzi, the benefits/employee relations manager, added a notation to the

---

[2]     The note, Pl. Ex. T., is not attached to an affidavit laying a foundation for the admissibility of the document, and its origin is thrown into question by Quigley's testimony. "Without a proper foundation there is no way for the Court to determine the genuineness of the document," including whether Quigley "actually prepared and agrees with what is said" in the note. Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995). However, even assuming the authenticity of the document for the purposes of this motion, as explained below, the statements made in the note are not material to the outcome of this motion.

request form that Plaintiff had used 395.5 hours during the previous 12 months for intermittent leave. (Id.)

In mid-July 2010, Mr. Quigley and Ms. Nunzi exchanged a series of e-mails concerning Plaintiff. Quigley initiated the conversation:

> Since we have started her reduced schedule under her LOA she has called out 3 out of the 7 days she was scheduled to work. It was my understand [sic] that the point of the reduced schedule was to help her work at least these three days. It seems to me that this arrangement is not work [sic] either. I am not sure if we can take anymore [sic] steps.

(Pl. Ex. V.) On July 21, 2010, Quigley sent another e-mail to Nunzi stating that

> I don't mean to seem impatient, but Dee Wright has called out on her LOA two of her scheduled days. She has not been to work since 7/13/10. In my opinion this is really becoming a burden on this department. Is she providing notes for all those days? Is there anything else we can do?

(Id.) Ms. Nunzi responded that she did not see doctors' notes in Plaintiff's folder and inquired which dates Plaintiff had missed since starting her reduced schedule. (Id.) Quigley replied that, in the three weeks that Plaintiff had been working a reduced work schedule, she had been absent five additional days, and provided the dates.[3] (Id.) Alicia Waugh, a registrar who worked alongside Plaintiff, testified that once she heard Quigley say that Plaintiff was "out again" and his tone "didn't seem to be one of satisfaction." (Waugh Dep. at 15:14-16:6.)

---

[3]     They were: July 9, 14, 16, 19 and 21, 2010. (Id.)

Plaintiff sought new intermittent leave for an additional three months, to begin on September 28, 2010. (Def. Ex. BB.) Plaintiff attached to her request documentation from Dr. Adam J. Benn, D.C., who explained that Plaintiff is "only able to work 3 days a week." (Id.) The request was "denied," with an accompanying letter from Ms. Nunzi, who explained that the new request "coincides with a request already in place." (Id.) Nunzi added that: "the reduced schedule leave that you are currently on is extended to November 12, 2010 per the medical documentation attached to the request form." (Id.) The documentation Nunzi relied upon was a note dated August 12, 2010, from Dr. Zeid, who wrote that "it would be beneficial for the above patient to work 3 days a week for the next 3 months." (Def. Ex. CC.) The parties agree that this leave request was "duplicative" and the original leave was extended as requested. (SMF ¶ 101; Pl. Response to SMF ¶ 101.)

On October 20, 2010, Ms. Nunzi met with Plaintiff. The parties have different impressions of the meeting. Nunzi commemorated the discussion in a letter to Plaintiff on October 28, 2010. (Def. Ex. AA.) Nunzi noted that Plaintiff's reduced work schedule had been approved in June, but that the "issue" was that

> you are calling out of work on the days that you are
> scheduled to work, either on a Monday, Wednesday or
> Friday. We discussed that if you are unable to meet the
> specification of this leave, it will be terminated and
> you will need to reapply for a different leave of

absence.

>If your physician feels that you are unable to work the above mentioned schedule, you have the following options. You may reapply for a reduced schedule leave allowing you to work two days per week; or a leave allowing you to work one day per week. As you know, a reduced leave must be mutually agreed upon. If you are unable to work any days, you may apply for a full medical leave of absence and apply to the State of New Jersey for disability.

(Id.) Plaintiff got the impression that she was "given an ultimatum by human resources when they told her she could no longer take intermittent FMLA leave because Defendants would not know when she would be coming to work. Instead, they told her that she could either take a reduced schedule leave or go out on disability." (Pl. Response to SMF ¶ 99.)[4]

In late October, Dr. Zeid provided Plaintiff with a new note

---

[4]    Plaintiff supports this statement by pointing to paragraphs 58-61 of the CSF. None of those paragraphs relate to a discussion with Ms. Nunzi in October 2010 but instead concern the end of her leave in February 2011. Paragraphs 55 and 56 of the CSF do discuss an "ultimatum" to take a reduced schedule or go out on disability, but they do not tie that directive to a discussion with Ms. Nunzi about Plaintiff missing scheduled work days without permission.
Plaintiff testified that "when I started out with my intermittent leave and it got to a point where I didn't know what days I could come to work, I was pressured either to go out on disability or give them specific days, which was pressure." (Wright Dep. at 141:11-18.) Plaintiff clarified that these discussions happened before formulating the plan for a three-day-per-week reduced schedule. (Id. 143:3-11.) She testified that she "was pressured into being specific," even though her leave was intermittent. (Id. 143:18-22.) She testified that between 2009 and January 2010 she was not explicitly told that she could not miss work to obtain treatment, but she was told her situation was "not working" and "they gave me an option. Reduce your schedule, or go on disability." (Id. 150:12-16.) None of these specifically refute Ms. Nunzi's description of her meeting with Plaintiff.

that said her three-day-per-week schedule would be beneficial "for the next 3 months beginning on 11/15/10." (Def. Ex. DD.) Accordingly, Plaintiff worked a three-day, reduced schedule through February 15, 2011. (SMF ¶¶ 102, 106-07, 110; Pl. Response to SMF ¶¶ 102, 106-07, 110.) Despite all of her absences in 2009 and 2010, Plaintiff's annual performance evaluations reflect that she continued to "meet" or "exceed" employer expectations. (Pl. Exs. J & K.)

Dr. Zeid cleared Plaintiff to return to work full time as of February 16, 2011. (Def. Ex. S; SMF ¶ 107; Pl. Response to SMF ¶ 107.) Accordingly, Plaintiff was notified that her reduced schedule leave would end on February 15 and she would resume full-time work on February 16, 2011. (SMF ¶ 109; Pl. Response to SMF ¶ 109; Wright Dep. at 178:11-18.) Plaintiff returned to work full time and did not make any further requests for leave. (SMF ¶¶ 116-17; Pl. Response to SMF ¶¶ 116-17.)

Plaintiff, however, asserts that she returned to work full time because she had been told that her FMLA leave had been exhausted and she "couldn't go back on leave until June 2011." (Wright Dep. at 171:11-172:3; 180:5-8; 182:1-13; 184:5-23; CSF ¶¶ 58-61.) Plaintiff testified that she was told she was not eligible for additional FMLA leave until June 2011.[5] (CSF ¶ 58.)

---

[5] At first, Plaintiff stated that this notification was "in writing," (Wright Dep. at 182:5-13), and Defendants make much of the fact that such a writing was never identified or produced

She testified that she told Ms. Nunzi and Peggy Griggs she thought she had unexhausted leave time remaining, but she also stated that "I didn't argue at that point. I just did what I had to do and I came back to work." (Wright Dep. at 171:1-25.)

Defendants assert that Plaintiff returned to work because Dr. Zied cleared her to do so, and nothing in the record suggests that Plaintiff "wanted" to take additional leave. (Def. Response to CSF ¶¶ 60-61; SMF ¶ 111.) Plaintiff admitted in her deposition that Dr. Zied was in no way forced to clear her for full-time work, and she did not instruct Dr. Zied to clear her for work. (Wright Dep. at 180:2-10.) She did not testify that she was unable to perform full-time work. Nonetheless, Plaintiff testified she felt "forced" to return because she was told she could not request additional leave until June. (Wright Dep. at 179:18-180:22.) The parties agree that, at the time of Plaintiff's termination, she "retained unexhausted FMLA leave time." (CSF ¶ 59; Def Response to CSF ¶ 59.)

**B. Comments relating to Plaintiff's age and computer skills**

Plaintiff asserts that during her employment, she "was subjected to frequent disparaging comments by Defendant Quigley, including him telling me to 'get with the times,' to 'move

---

during discovery. Later, Ms. Wright testified that Ms. Nunzi told her, in "the midst of maybe our last phone conversation" when Plaintiff gave Ms. Nunzi her the last doctor's note, that Plaintiff would next be eligible for leave in June 2011. (Id. at 183:4-184:13.)

faster' and that the 'younger employees have learned the computer system much faster'" than she did. (Wright Certification [Docket Item 32-5] ¶ 18.) Plaintiff was 51 years old at the time of her termination. (Id. ¶ 9.) Plaintiff testified that, from January 2011 until her termination, Quigley would tell her to "get with the times" in a "joking manner, but I took it to be very hurtful." (Wright Dep. at 124:19-125:1.) Plaintiff explained that she was slower to learn new computer software programs than her colleagues, who were younger, and she felt that Quigley used the phrase "get with the times" to mean that "because I'm older . . . I'm not gravitating [to] it like everyone else." (Id. 123:4-12, 124:8-12.) Plaintiff testified that Quigley did not direct similar comments at her colleagues "because they're quite savvy with the computer and learning new applications" and that "they knew I was the -- always the one that had to ask for extra help with this, that and the other." (Id. at 125:13-20, 125:2-6.) For instance, when Plaintiff told Quigley that she needed help with the program Excel, Quigley responded "Oh, come on, Dee. Again?" and "You got to get with the times." (Id. 126:19-24.) Plaintiff testified that Quigley never directly told her that she was "too old." (Id. at 123:20-24.) Plaintiff also testified that she did not complain to anyone at SMH about Quigley's comments because, she considered the effort futile. (Id. 126:3-5.) She asserts that the comments "became increasingly more" frequent in January 2011.

(Id. at 127:11-13.)

At the time of Plaintiff's termination, Defendants employed 33 registrars in Plaintiff's department: seven in their twenties, ten in their thirties, four in their forties, and six each in their fifties and sixties.[6] (Pl. Ex. B.) Of the individuals hired as registrars between March 7, 2011, and October 3, 2011, four were 27 years old or younger, three more were between the ages of 33 and 40 years old, and two more were 49 and 55, respectively. (Id. at 9.) Plaintiff's replacement, who had been working at SMH in a different capacity, was a female who was 40 years old. (Id. at 5.)

**C. The incident with patient C.W.**

On Friday, May 6, 2011, Plaintiff registered a patient, C.W., who had been diagnosed as HIV positive. (SMF ¶ 12.) The accounts of the incident conflict. According to Plaintiff, C.W. was crying and Plaintiff reassured him that he was "going to be okay," "I'm here to help you," and she was "going to take care of [him]." (CSF ¶ 71.) As Plaintiff updated his demographic information for SMH records, C.W. became impatient, and Plaintiff suggested that he walk around to calm his nerves. (Id. ¶ 72.) When C.W. returned, he had a plastic bag with a urine sample in it, which he placed on Plaintiff's desk. (Id. ¶ 73.) Plaintiff

---

[6]    Defendants disclosed the "current age," as of February 24, 2012, the date the response was filed. (Id.)

12

believed the sample might have been unsanitary and asked him to remove it from her desk. (Id. ¶ 74.) Plaintiff asserts that C.W. apologized and removed the bag. (Id. ¶ 75.) C.W. then began confiding "personal medical information" to Plaintiff, and she asked if there was anyone she could call to sit with C.W. and support him. (Id. ¶ 76.) The patient declined the offer, and left the registration area. (Id. ¶ 77.)

Defendants' version of the incident is drawn from complaints that C.W. made to Dr. Christopher Lucasti, his infectious disease physician, and the house supervisor, Barbara Kelly, and from a discussion that Mr. Quigley later had with C.W., after the complaints had been brought to Quigley's attention. (SMF ¶¶ 14, 22, 26; Def. Ex. F & G.) According to these sources, C.W. inadvertently had put urine and blood specimens, sealed in a bag, on the desk, and Plaintiff responded with a comment along the lines of "did you just come from the infectious disease doctor? . . . no one wants to catch what you have." (Quigley Dep. at 119:21-120:7; see also Def. Ex. H ["Notes regarding Termination of Deidra Wright: Conversation with the Patient," Docket Item 26-2] ("Patient stated he presented with Urine and blood specimens that were sealed in a bag.").) Dr. Lucasti reported that Plaintiff's comment made C.W. "feel very less than a human being." (Def. Ex. F.) Plaintiff asked C.W., who had become visibly upset, to step out of the registration area because she

"doesn't do as well with tears," or something to that effect.
(Quigley Dep. at 120:10-13; Def. Ex. H ("'I don't do well with
tears can you step out and calm yourself'").) C.W. also
complained that, during his registration, another employee
stopped by to discuss personal Mother's Day plans with Plaintiff.
(Quigley Dep. at 120:15-20; Def. Ex. H.) Ms. Kelly's e-mail to
Quigley on the subject included C.W.'s further allegation that
Plaintiff "made a comment about the fact that he would have to
apply for charity care because he had no insurance and 'I don't
suppose you work'." (Def. Ex. G; see also Def. Ex. H (Quigley
reporting that Plaintiff told C.W. he'd have to apply for charity
care and if he did not fill out an application "they will not see
you in the future.").) Kelly opined in her e-mail that C.W.
"seemed very believable to me, but perhaps you [Quigley] could
follow up." (Id.) Dr. Lucasti, in a letter to Mr. Quigley
relaying C.W.'s allegations, editorialized that "I cannot believe
that someone in the admissions department would treat a patient
so poorly." (Def. Ex. F.)[7]

---

[7]     Alicia Waugh, Plaintiff's coworker, was working alongside
Plaintiff at the time of the C.W. incident. Minutes after
Plaintiff was terminated, Waugh spoke with Laura Kennedy, the
director of labor relations at SMH, about what she witnessed.
(Waugh Dep at 24:1-10.) Waugh told Kennedy that she "didn't
recall anything, I didn't know who the patient was that she was
speaking of." (Id. at 25:5-15.) Waugh testified that she had not
observed anything out of the ordinary and that she didn't recall
Plaintiff saying or doing anything to any patients that could
have been considered rude or disrespectful. (Id. at 25:16-19,
28:7-10.)

**D. Plaintiff's termination**

On May 9, 2011, Mr. Quigley spoke with C.W. by telephone and discussed the incident. (Quigley Dep. at 118:17-119:6.) Quigley testified he did not recall interviewing other employees or witnesses about the incident. (Id. 123:15-23.) On Tuesday, May 10, 2011 -- Plaintiff's first day of work after May 6 -- Quigley and Laura Kennedy, the director of labor relations at SMH, met with Plaintiff to discuss the incident. (SMF ¶¶ 33-34.) Plaintiff initially could not recall any incident with a patient, but as Kennedy described the allegations in more detail, Plaintiff remembered, reacting with surprise that C.W. had made a complaint against her. (SMF ¶¶ 38-41.) Kennedy gave Plaintiff an opportunity to tell her side of the story. (SMF ¶ 46; Pl. Response to SMF ¶ 46.) Plaintiff then was asked to step outside, while Kennedy contacted Alan Beatty, vice president of human resources, who had been apprised of the situation prior to the interview, to give him additional facts. (SMF ¶ 52; Pl. Response to SMF ¶ 52.) Mr. Beatty was informed that Plaintiff denied saying anything inappropriate, but he approved her termination nonetheless. (SMF ¶ 53; Pl. Response to SMF ¶ 53.)

Later that day, Mr. Quigley drafted a letter to Plaintiff informing her that her "actions violate the vision and values of the Spirit of Shore, the Shore Memorial Mission Statement and the Employee Conduct and Discipline guideline. Based on the facts,

termination is warranted for gross misconduct related to poor job performance." (Def. Ex. L.)

Plaintiff was told she could appeal her termination decision, which she did, alleging that her termination was unfair and not conducted according to "protocol." (SMF ¶¶ 56, 58-59.) In her appeal, Plaintiff did not make allegations that her termination was related to her age, any actual or perceived disability, or her medical leave. (SMF ¶ 59; Pl. Response to SMF ¶ 59.) Plaintiff stated: "I totally understand my position of being on the front line and the first impression means a lot. I am just asking that the investigation be sought by interviewing the patient . . . and my name be cleared of any wrong doing." (Def. Ex. N.) As part of the appeals process, Robert Perry, an administrative director, interviewed Plaintiff, and he "found no new evidence of the basic information provided that suggested that there be a change in the determination that Ms. Wrights' discharge be overturned." (Def. Ex. P.) Plaintiff was informed that she could further appeal her termination, but did not.[8] (SMF

---

[8]     Plaintiff asserts additional facts about the procedure and timing of her termination, which she believes suggest improper conduct. Her main assertion is that the decision to terminate Plaintiff was made before Quigley and Kennedy terminated Plaintiff. (CSF ¶¶ 86-96.) Plaintiff also asserts that Defendants' investigation was incomplete, because Defendants did not interview witnesses to the incident. (CSF ¶¶ 84, 102-111.) Specifically, Plaintiff contends that Ms. Waugh was a witness to the event and she did not witness any disrespectful behavior by Plaintiff. (CSF ¶ 106.) Defendants dispute that the record supports Plaintiff's conclusions and, in some cases, factual

¶ 68.)

**E. Procedural history**

Plaintiff filed a two-count Complaint. [Docket Item 1.]

Count I alleges interference and retaliation claims under the

FMLA. [Id. ¶¶ 26-34.] Count II alleges violations of the NJLAD

for retaliation based on age discrimination and/or discrimination

based on an actual or perceived disability. [Id. ¶¶ 35-36.]

Defendants filed the present motion for summary judgment.

## III. Jurisdiction

The Court has subject matter jurisdiction over this action

under 28 U.S.C. § 1331, because Count I alleges violations of a

federal statute. The Court has supplemental jurisdiction over

Plaintiff's state-law claims that arise out of the same case or

controversy, pursuant to 28 U.S.C. § 1367.

## IV. Standard of review

A court shall grant summary judgment "if the movant shows

that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A dispute is "genuine" if, based on the evidence in the

record, a reasonable jury could return a verdict for the non-

---

assertions. (Def. Response to CSF ¶¶ 86-97, 105.)
    There is disagreement whether the decision to terminate
Plaintiff was made prior to Plaintiff's interview. The parties
agree, however, that the record shows that Quigley and Kennedy
did not seek or obtain final authorization to terminate Plaintiff
until after Defendants interviewed Plaintiff. (SMF ¶ 53.) The
Court will address these factual disputes in more depth, infra.

moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit. Id. The court will view evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## V. Discussion

### A. Interference under the FMLA

The FMLA entitles eligible employees to take a total of "12 workweeks of leave during any 12-month period" due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employees are "eligible" if they have been employed "for at least 12 months by the employer with respect to whom leave is requested under section 2612" and they have worked for 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital . . . ; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter." 29 U.S.C. § 2615(a)(1). U.S. Department of Labor regulations further explain that "[i]nterfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

Thus, FMLA permits a cause of action for interference with the exercise of FMLA rights through inhibiting or discouraging an employee from requesting valid FMLA leave. Courts in this Circuit have held that if employers' actions would "chill" or "inhibit" the employees from exercising FMLA rights, a claim for interference may arise. See Bravo v. Union Cnty., No. 12-2848, 2013 WL 2285780, *9 (D.N.J. May 23, 2013) (denying a motion for summary judgment because a reasonable jury could find that an employer's statements and conduct "would inhibit her from exercising FMLA rights in the future" and a jury could find prejudice because the defendant delayed providing FMLA paperwork and forced plaintiff to suffer a two-week delay in receiving treatment); Grosso v. Fed. Express Corp., 467 F. Supp. 2d 449, (E.D. Pa. 2006) (denying summary judgment because a jury could conclude that the employer discouraged plaintiff from exercising his rights); Shtab v. Greate Bay Hotel & Casino, Inc., 173 F. Supp. 2d 255, 268 (D.N.J. 2001) (denying summary judgment because reasonable persons could conclude that the employee was chilled from asserting his FMLA rights).

19

To establish liability for interference generally under the FMLA, a plaintiff must show only that (1) she was entitled to take FMLA leave and (2) the employer denied her right to do so, resulting in prejudice. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 312 (3d Cir. 2012); see also Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (stating that if an employee shows interference, an employer is liable if "the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief . . . .") (citations omitted); Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004) ("Conoshenti will show an interference with his right to leave under the FMLA . . . if he is able to establish that this failure to advise rendered him unable to exercise that right in a meaningful way, thereby causing injury."); Bracy v. Melmark Inc., No. 12-3323, 2013 WL 5330147, at *5 (E.D. Pa. Sept. 24, 2013) (stating that "an employee must show that she was entitled to benefits under the FMLA and that her employer impermissibly denied her those benefits" and "must show prejudice from an employers' interference with her FMLA rights").[9] To prevail on an

---

[9]     The Third Circuit's Model Civil Jury Instructions summarize the elements of an interference claim as follows: (1) Plaintiff had a medical condition, (2) the condition was a serious health

interference claim, a plaintiff need not show that the employer treated other employees differently or acted with an improper motive. Parker v. Hanhemann Univ. Hosp., 234 F. Supp. 2d 478, 485 (D.N.J. 2002) (citing Hodgens v. Gen'l Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)). "[T]he employer cannot justify its action by showing that it did not intend . . . or . . . had a legitimate business reason" for interfering with the employee's rights. Id.

Thus, where an employee alleges that her employer interfered with FMLA rights by inhibiting or discouraging her from using such leave, it follows that the plaintiff must show that such a violation occurred and that she suffered prejudice thereby, as suggested by the Supreme Court in Ragsdale, 535 U.S. at 89. Thus, the essential elements of Lichtenstein, 691 F.3d at 312, including the showing of prejudice, would be formulated for the "discouragement" claim to require a plaintiff to show that (1) she was entitled to take FMLA leave, (2) her employer interfered with her right to do so, and (3) she suffered prejudice because she would have requested and received FMLA leave but for her

condition within the meaning of the FMLA, (3) Plaintiff gave appropriate notice of her need to be absent from work, and (4) Defendants interfered with the exercise of Plaintiff's right to unpaid leave. Model Civil Jury Instructions for the District Courts of the Third Circuit § 10.1.1 (2011). These elements do not speak to the claim Plaintiff advances here that Defendants discouraged her from exercising her FMLA rights to the point that she made no request to be absent from work, or that she accepted a reduced schedule rather than seek intermittent FMLA leave.

employer's discouragement. <u>See</u> <u>Brock-Chapman v. Nat'l Care</u> <u>Network, LLC</u>, No. 10-454, 2013 WL 169177, at *7-*8 (N.D. Tex. Jan. 16, 2013) (denying summary judgment when an employee claimed her employer discouraged her from taking intermittent leave and instead forced her to take paid time off, stating there was a genuine issue of fact as to whether the arrangement harmed her financially).

The parties here do not dispute that Plaintiff had a serious medical condition within the meaning of the act, she was generally eligible for leave, and the employer was required to provide FMLA benefits. The key question is whether Defendants denied or inhibited Plaintiff from exercising FMLA rights, and, if so, whether Plaintiff suffered prejudice.

Defendants argue they are entitled to summary judgment on the interference claim because Plaintiff was "granted every leave she requested and was not prevented from exercising any of her FMLA rights . . . ." (Def. Mot. Br. at 19.) Defendants further argue that Plaintiff cannot establish prejudice. "[E]ven if Plaintiff had made or planned to make an additional request for FMLA leave . . . , absent evidence that she would have been eligible under the FMLA for leave at that time and that she could meet the other requirements of the FMLA," no prejudice has been shown. (<u>Id.</u> at 20.)

In response, Plaintiff argues that it is undisputed that

22

Plaintiff was eligible for FMLA leave. (Pl. Opp'n at 15.) In addition, she asserts she was

> denied benefits under the FMLA by being discouraged from taking medical leave, threatened with disciplinary action if she exercised her FMLA rights, pressured to take a reduced schedule leave rather than an intermittent leave and improperly informed that her FMLA leave allotment expired in February 2011 and that she would not be eligible for FMLA again until June 2011.

(Id.) Defendant disputes that the record contains support for the claim that "she was discouraged from taking medical leave," because she cannot show that any request for medical leave was denied. (Reply at 5.) As to the allegation that Plaintiff was erroneously told her leave had been exhausted, Defendants dispute that she was misinformed and argue that Plaintiff has not established a dispute of fact as to prejudice, because (1) she was medically released to return to work, (2) no one forced her doctor to release her, (3) she did not tell her doctor to release her, and (4) as a result of her improved medical condition, she no longer was qualified for FMLA leave. (Id. at 6.) "Plaintiff can point to nothing in the record to support her claim that she needed leave after February 2011." (Id.)

Assuming that Defendants interfered with Plaintiff's rights, Plaintiff has not adduced evidence that would enable a reasonable jury to find that she suffered prejudice from the interference. Plaintiff acknowledges that a plaintiff making an interference claim "must also prove prejudice by showing, for example, that

23

had she been properly informed of her FMLA rights, she could have structured her leave differently." (Pl. Opp'n at 12.) However, when applying the law to the facts of this case, Plaintiff concludes only that "Defendants interfered with her FMLA rights," that her employer was a "qualified employer pursuant to the FMLA," that Plaintiff "properly notified Defendants about her need for FMLA, applied for FMLA leave and took FMLA leave." (Id. at 15.) Plaintiff details the ways Defendants interfered with her rights, but Plaintiff does not discuss prejudice, nor does she cite to evidence of prejudice in the record. (Id.)

A jury could reasonably find that Defendant misinformed her that she had no FMLA eligibility after February 2011 as further evidence of Defendant's discouragement of her taking FMLA leave and that such misinformation was interference with her FMLA rights. But the record shows that Plaintiff had been cleared by her doctor to return to work full time in February 2011, and that she did not tell her doctor to so clear her. (Wright Dep. at 180:2-8.) She does not testify that, in fact, she could not work full time by February 2011. (Id.) She does not testify that she sacrificed medical treatment in order to be at work full time. Plaintiff testifies that she was inhibited from requesting leave but presents no evidence that her conditions required leave after that point. Rather, she returned to work, apparently without incident until her interaction with C.W., and it is not alleged

24

that the incident with C.W. was precipitated by or related to her
own medical conditions in any way. Plaintiff testified that, in
February 2011, she was sick and that working would be hard for
her, but she does not explain what injury or prejudice resulted
from working full time. (Wright Dep. at 180:5-8, 181:16-24.) On
this record, no reasonable jury could conclude that Plaintiff
suffered prejudice based on misinformation about her leave in or
after February 2011.

From Plaintiff's testimony and other documentary evidence, a
jury could reasonably infer that Defendants discouraged Plaintiff
from requesting intermittent leave in October 2010. However,
Plaintiff again fails to point to evidence of prejudice. First,
Plaintiff never made a request for intermittent leave that was
denied, ultimately, or which did not coincide with leave already
in place. She got everything she asked for. However, that does
not end the inquiry, because Plaintiff argues that she was
chilled from making further requests. The problem for Plaintiff
is that the record does not contain evidence that she had a
medical condition that required intermittent leave after October
2010 or that failure to obtain intermittent leave prejudiced her.
Intermittent leave may be taken when "medically necessary" and
when the timing of needed medical treatment is unpredictable. See
29 C.F.R. § 825.302(f); 29 U.S.C. § 2612(b). None of the notes
from Plaintiff's doctors suggest that Plaintiff's treatment

schedule was so unpredictable that intermittent leave was necessary after October 2010. Rather, the notes recommend that Plaintiff work three days a week, and when Plaintiff requested this reduced schedule, she received it. Plaintiff never was forced to accept a schedule imposed by her employer that was inconsistent with her doctors' medical recommendations that she provided Defendants.

Plaintiff does not testify how she was prejudiced by taking a reduced schedule. For example, there is no testimony that she sacrificed medical treatment, that she accumulated unexcused absences after the "ultimatum" in October which had negative repercussions for her at work, that her compensation was affected, or that she suffered any kind of adverse employment action related to medical or sick leave after accepting reduced leave in October 2010.[10] Plaintiff simply does not explain why, as of October 2010, she needed or would qualify for intermittent leave, nor does she explain what prejudice or injury she suffered by working a three-day reduced schedule through February 2011.[11]

---

[10]    These are mere examples of the kind of evidence Plaintiff could have produced. The Court does not consider these to be exhaustive or necessary proofs for creating a triable issue for FMLA interference.

[11]    To the extent Plaintiff argues that her interference claim is based on events that occurred as early as June 2010, that contention is undercut by her own testimony. Plaintiff testified that her request for reduced leave, in June 2010, supported with a recommendation from her doctor that she work three days a week, is not a basis for her interference claim. (Wright Dep. at 173:9-

Defendants identified Plaintiff's inability to prove prejudice as grounds for summary judgment. (Def. Mot. Br. at 19-21). Plaintiff concedes that she must show prejudice. (Pl. Opp'n at 12.) Plaintiff had the opportunity to produce evidence of prejudice but did not do so.[12] Her testimony amounts to an unsupported conclusion that she was entitled to take intermittent leave under the FMLA and related regulations, but she fails to substantiate that claim for the period in question and she fails to cite evidence that she was injured or prejudiced by accepting a reduced schedule in October 2010 or returning to work full time in February 2011. Defendants' motion for summary judgment will be granted for Plaintiff's FMLA interference claim.

---

14, 175:12-176:2.) To the extent Plaintiff argues she was chilled by Mr. Quigley's statements, the record shows the opposite. Once, Plaintiff brought her request for leave to a supervisor after it was denied by Quigley, and the request was granted. Thereafter, Plaintiff made other requests for leave. A jury could not reasonably find that Plaintiff was chilled by Mr. Quigley's statements.

[12]    These facts distinguish this case from Conoshenti, 364 F.3d at 142-46. In that case, the defendant employer "never asserted that [the plaintiff] Conoshenti could not meet his burden of proving that he could have structured his leave differently. Nor did [the defendant employer] argue that a showing of prejudice was an essential element of Conoshenti's claim or that such a showing was material in any way." Id. at 146. The Third Circuit held that Conoshenti was "not required, pursuant to Fed.R.Civ.P. 56(e) to respond with specific facts establishing a genuine issue with respect to the prejudice requirement." Id. Here, by contrast, Defendants properly identified prejudice as a required element of Plaintiff's interference claim, and, in opposition, Plaintiff failed to provide evidence of prejudice.

## B. Retaliation under the FMLA

In order for Plaintiff to prevail on a retaliation claim under the FMLA, she "must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein, 691 F.3d at 301-02 (citing Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009)). Because retaliation claims "require proof of the employer's retaliatory intent," courts borrow the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to assess claims that are based on circumstantial evidence to show that the employee's termination was pretextual. Id. at 302.

Under this framework, Plaintiff has the initial burden to establish a prima facie case of retaliation by pointing to evidence sufficient to create a genuine factual dispute about (1) her invocation of an FMLA right, (2) her termination, and (3) causation. Id. Upon such a showing, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for her termination. Id. (quoting McDonnell Douglas, 411 U.S. at 802). Defendants' burden is "minimal," id.; it is "one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 509 (1993)). If Defendants meet their burden, Plaintiff must
then "point to some evidence, direct or circumstantial, from
which a factfinder could reasonably either (1) disbelieve the
employer's articulated legitimate reasons; or (2) believe that an
invidious discriminatory reason was more likely than not a
motivating or determinative cause of the employer's action."
Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Plaintiff
may not "discredit" Defendants' proffered reason simply by
showing "that the employer's decision was wrong or mistaken,
since the factual dispute at issue is whether discriminatory
animus motivated the employer, not whether the employer is wise,
shrewd, prudent, or competent." Id. at 765. Instead, Plaintiff
"must demonstrate such weaknesses, implausibilities,
incoherencies, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable factfinder
could rationally find them 'unworthy of credence,' and hence
infer 'that the employer did not act for [the asserted] non-
discriminatory reasons.'" Id. (emphasis in original, citations
omitted).

### 1. Prima facie case

The parties agree that Plaintiff took FMLA leave and was
terminated, satisfying the first two elements of a prima facie
retaliation claim. Defendants argue that Plaintiff fails to make
a prima facie case because she cannot establish causation. (Def.

Mot. Br. at 21.) Defendants point out that Plaintiff's termination was nearly three months after her last FMLA leave ended, Plaintiff had made no intervening leave requests, and Plaintiff has failed to offer "evidence of any pattern of antagonism" toward Plaintiff stemming from her taking protected leave. (Id. at 21-22.)

Plaintiff argues that temporal proximity permits an inference of causation because she "was terminated less than three months after returning from her approved FMLA leaves and less than three weeks before (according to Defendants' incorrect statements to Ms. Wright) she was eligible for FMLA in June of 2011." (Pl. Opp'n at 18.) In addition, Plaintiff contends that a pattern of antagonism can be established to show causation on the strength of the following facts: (1) Mr. Quigley threatened Plaintiff with written discipline if she took FMLA leave in 2010, and (2) Defendants gave Plaintiff an "ultimatum" to take reduced leave or go out on disability and (3) improperly informed her that she could not take additional FMLA leave until June 2011.[13] (Id. at 19.)

---

[13] Plaintiff also suggests that Mr. Quigley complained to human resources "that Ms. Wright's intermittent FMLA absences were becoming a burden on the department and made comments to Ms. Wright about moving faster in the workplace." (Id. at 19.) The record does not support that Quigley complained about Plaintiff's FMLA leave; rather, the documents indicate that he questioned her unapproved absences that occurred on her scheduled days, while she was working a three-day week. Second, comments that Plaintiff move "faster" bear no logical connection to antagonism to her FMLA leave.

Causation may be shown "through temporal proximity between the protected activity and the adverse employment action; an intervening pattern of antagonism; or the evidence taken as a whole." Bartos v. MHM Corr. Servs., Inc., 454 F. App'x 74, 78-79 (3d Cir. 2011) (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000), and Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).) Here, Plaintiff does not adduce sufficient evidence to support causation on any of these theories.

The timing of Plaintiff's termination, on its own, is not unduly suggestive of a causal connection. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) ("a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment"); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (holding that two months is "not so close as to be unduly suggestive" of causation). Plaintiff's final FMLA leave ended on February 15, 2011, and she was terminated nearly three months later, on May 10. Although Plaintiff claims that her termination came mere weeks before June 2011, the month she had been told she would be eligible for FMLA leave again, Plaintiff had been working full time since February 16, 2011, and gave no indication that she intended to take more leave. There is no record evidence that Plaintiff had a problem

with attendance after her reduced schedule leave ended and no indication that Defendants knew or suspected that Plaintiff would request more leave. There is no medical evidence showing that Plaintiff continued to have a serious medical condition, and certainly none that was communicated to Defendants such that they preemptively terminated her before she could take more leave. Therefore, the June date cannot be a reliable marker for establishing causation for a May termination.

Plaintiff's claim that she was subject to ongoing antagonism is unavailing. Accepting, for the sake of argument, that Mr. Quigley did threaten Plaintiff with written discipline for taking FMLA leave, he never actually disciplined Plaintiff. In fact, she never was subject to disciplinary action, aside from her termination following the C.W. incident, and Defendants granted all of Plaintiff's requests for leave that were not redundant of existing requests and which were supported by doctors' notes. Accepting further that Defendants forced Plaintiff to take a reduced schedule, Defendants later extended the leave at Plaintiff's request and returned her to full-time work only after her doctor cleared her for such a schedule, inviting Plaintiff to submit a new request if she needed extra time off. The additional disputed fact of whether Defendants misinformed Plaintiff about her unexhausted FMLA leave does not create a pattern of antagonism.

Courts in this Circuit permit an inference of causation when there is a consistent, continuous course of discriminatory treatment. See Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993) (finding a pattern of antagonism where the plaintiff was subject to a "constant barrage of written and verbal warnings ..., inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge'"); Urbanic v. Donahoe, No. 11-805, 2013 WL 1149914, at *6 (W.D. Pa. Mar. 19, 2013) (requiring "a constant and consistent pattern of antagonism in the intervening time frame . . . to raise an inference of causation"); Flaig v. Aladdin Food Mgmt. Servs., LLC, No. 12-839, 2012 WL 5288716, at *5 (W.D. Pa. Oct. 23, 2012) (finding a pattern of antagonism when the plaintiff's employment duties were changed, he was subject to harassment by coworkers, and his employer sought to hire a replacement for him after he returned to work after filing a grievance). Plaintiff attempts to show causation by highlighting conduct that occurred over several months that is neither constant nor consistent with the kind of hostile antagonism necessary to establish her prima facie case. A reasonable jury could not infer causation from this claimed pattern of antagonism.

The Third Circuit also permits an inference that taking FMLA leave was the likely reason for a plaintiff's termination based

on the "evidence, looked at as a whole . . . ." Farrell, 206 F.3d at 280; see also Thurston v. Cherry Hill Triplex, No. 06-3862, 2008 WL 9374284, at *10 (D.N.J. Aug. 5, 2008); Rogers v. Alternative Res. Corp., 440 F. Supp. 2d 366, 376-77 (D.N.J. 2006). A "'broad array' of circumstantial evidence may be used to illustrate the causal link, including inconsistent reasons for termination, evidence casting doubt on reasons proffered for termination, and a change in demeanor after a complaint of discrimination." Watkins v. Nabisco Biscuit Co., 224 F. Supp. 2d 852, 872 (D.N.J. 2002) (quoting Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 289 (3d Cir. 2001)). This inquiry overlaps considerably with the pretextual analysis.

Although Plaintiff highlights alleged inconsistencies in deposition testimonies, Defendants have not advanced inconsistent theories for her termination. The record is clear that Defendants have consistently asserted that Plaintiff's termination related to her treatment of C.W., even if Defendants at one moment or another referred to Plaintiff's "poor job performance." Plaintiff could not have exited SMH thinking that she was terminated for any reason other than the incident with C.W., considering the content of the meeting with Mr. Quigley and Ms. Kennedy and Plaintiff's unambiguous termination letter. Defendants' justification for the termination has not changed since the day of the termination.

By painting a picture of Defendants' investigation of the
C.W. incident as incomplete, Plaintiff attempts to show that her
termination was pretextual; the more cursory or dubious the
investigation, the more likely the termination is to be
pretextual. In general, the Court's role is to determine "whether
discriminatory animus motivated the employer, not whether the
employer is wise, shrewd, prudent or competent." Jones v. Sch.
Dist. of Philadelphia, 198 F.3d 403, 413 (3d Cir. 1999) (quoting
Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d
Cir. 1997)); see also Fuentes, 32 F.3d 765. However, in Kowalski
v. L & F Prods., 82 F.3d 1283, 1290 (3d. Cir. 1996), the Third
Circuit vacated the district court's order granting summary
judgment when the plaintiff-employee had been fired entirely on
the basis of report prepared by an investigator who never
witnessed the employee's conduct that purportedly demonstrated
fraudulent disability claims and whose two main sources never
said they saw the employee perform services inconsistent with her
disability claims. Moreover, there had been no basis to
investigate the employee in the first place, the employer's
justification for hiring the investigator changed over time, and
the report was never admitted into evidence. Id. In Kowalski, the
Third Circuit endorsed the general proposition that "even if
defendant wrongly believed plaintiff acted fraudulently in
procuring her disability leave, if defendant acted upon such a

belief it cannot be held guilty of retaliatory discharge." Id. at 1289. But the Third Circuit held that "where the contents of the primary piece of evidence upon which the defendant relies is contradicted by witness testimony and is not even introduced, summary judgment is inappropriate."[14] Id. at 1290.

Here, even if Defendants' investigation could have been more thorough or deliberate, this case is distinguishable from Kowalski. In the present case, Defendants had a legitimate reason to investigate Plaintiff, they interviewed C.W. themselves prior to her termination, they found C.W.'s complaint to be credible, his story did not change over time, nor did Defendants' reasons for termination, and Defendants gave Plaintiff an opportunity to respond to the allegations before her termination was authorized. Furthermore, it is uncontroverted that C.W. made allegations against Plaintiff, documents on which Defendants based their decision were admitted into evidence, and Plaintiff admitted that such behavior could be grounds for termination. There is no suggestion in the record that either C.W., Dr. Lucasti, or Ms. Kelly had any reason to fabricate the charges against Plaintiff. It is not the province of the Court to decide whether Plaintiff's termination was warranted, or even if the events unfolded as Defendants and C.W. claim they did; it is only for the Court or

---

[14]    The Third Circuit panel added that the fact that the defendant never offered the report into evidence was not "determinative" but it was "relevant." Id. at 1290.

the factfinder to determine whether Plaintiff's termination was executed for prohibited reasons. See Jackson v. Planco, 431 F. App'x 161, 166 (3d Cir. 2011) (rejecting the plaintiff's argument that the employer's "failure to investigate further before making" termination decisions "establishes . . . 'bad faith' sufficient to support a finding of pretext"); Jones, 198 F.3d at 413. The investigation here is not as lacking as that in Kowalski, and it is not so lacking that it is suggestive of bad faith or pretext.

The only evidence Plaintiff musters to show Defendants' hostility toward her taking FMLA leave is Mr. Quigley's alleged refusal to let Plaintiff take time off for an appointment (a request which was immediately granted by a more senior supervisor), Defendants' preference for Plaintiff to take reduced leave instead of intermittent leave, and misinformation about Plaintiff's leave eligibility. The record does not contain evidence of comments by Defendants demonstrating animosity toward Plaintiff taking approved FMLA leave.[15] The record shows that Defendants approved all non-duplicative requests for FMLA leave and contains no evidence of disciplinary action against Plaintiff. It is undisputed that after Plaintiff's doctor cleared her to return to work full time, she did so and did not request

---

[15] Defendants did express more concern about Plaintiff's unexcused absences, once she began a reduced schedule, but those absences were not covered by the FMLA.

additional leave. There is no medical evidence as to Plaintiff's condition after she returned to work full time, and the incident that led to Plaintiff's firing occurred nearly three months after she last took or sought FMLA leave, without indication that she needed to, or would, take more leave in the future. This evidence, viewed as a whole and in the light most favorable to the Plaintiff, simply does not permit the inference that Plaintiff's FMLA leave was likely a determinative reason for her termination. As such, Plaintiff fails to establish a prima facie case of retaliation, and summary judgment will be granted on the retaliation claim.

## 2. Prextext

Even if Plaintiff could establish a prima facie case, for largely the reasons explained above and those set out below, she cannot show that Defendants' stated reason for her termination was pretextual. Therefore, summary judgment will be granted on the retaliation claim upon this alternate ground.

Defendants argue it is undisputed that C.W. complained about his interaction with Plaintiff and that Plaintiff testified if a registrar told a patient what it is alleged that Plaintiff said to C.W., the registrar should not be able to keep his or her job.[16] It is not enough, Defendants suggest, for Plaintiff to

---

[16] At her deposition, Plaintiff was asked, "Do you think that a registrar, any registrar, should be able to keep their jobs if they said what was alleged that you said?" (Wright Dep. at 84:5-

"disagree with the results of an employer's investigation." (Def.
Mot. Br. at 26.) Defendants argue that the record does not
support a finding that FMLA leave was more likely than not a
motivating or determinative cause of her termination. (Id.)

Plaintiff argues that Defendants' alleged reason for
Plaintiff's termination is "inconsistent and contradicted by
their own conduct, testimony or sworn statements." (Pl. Opp'n at
21.) First, Plaintiff suggests that the proffered reason for
termination has changed ("poor job performance" versus "gross
misconduct"). The Court has already rejected this contention.

Plaintiff next argues that while Mr. Quigley and Ms. Kennedy
testified that they made the decision to fire Plaintiff, their
answers to interrogatories state they did not terminate
Plaintiff. In support, Plaintiff cites testimony by Kennedy, who
stated she and Quigley, "[a]nd others," decided to terminate
Plaintiff. (Kennedy Dep. at 7:4-10.) Defendants admit that
Quigley, Kennedy and Mr. Beatty made the decision to terminate
Plaintiff. (Def. Response to CSF ¶ 86.) This dispute is not
material.

Plaintiff also asserts that Mr. Quigley spoke with Robert
Perry, the administrative director of revenue cycle at SMH, about

---

7.) She responded: "I'm going to answer that with a no, but I
never said that." (Id. at 84:8-9.) She reiterated: "My answer to
you is, no, I don't think that, but I believe you're trying to
put words in my mouth . . . ." (Id. at 84:19-21.)

Plaintiff's imminent termination before May 10, despite Quigley's testimony that he did not speak with anyone other than Ms. Kennedy about the incident. (CSF ¶¶ 90-93.) Plaintiff suggests Quigley needed Perry's approval before terminating Plaintiff. (CSF ¶ 94.) Plaintiff asserts that James Foley, the senior vice president and chief financial officer of SMH, was aware of the termination process before Plaintiff was terminated. (CSF ¶ 96.) Plaintiff suggests these facts indicate that Quigley made his decision to terminate her prior to interviewing her. (CSF ¶ 94.)

Defendants respond that Mr. Perry merely testified that he spoke with Quigley on "the day of or the day before" Plaintiff was terminated and that Quigley told Perry that "he talked to human resources and [termination] was the action that they were pursuing." (Def. Response to CSF ¶ 93; Pl. Ex. L at 15:20-22; 16:2-6.) Foley's testimony indicated that "there was a termination in process, yes, or recommended." (Pl. Ex. G. at 16:8-12.) Regardless, it remains undisputed that the final authorization to terminate Plaintiff was made after the meeting with Plaintiff. (SMF ¶ 53.) The cited portions of the record do not give rise to a reasonable basis for finding that a final decision to terminate Plaintiff was made prior to interviewing Plaintiff. Even if Defendants were pursuing or leaning toward termination prior to talking with Plaintiff, the course of action only began after Quigley received what he believed to be a

credible complaint against Plaintiff. This evidence does not permit a reasonable jury to find that it is more likely than not that Plaintiff's termination was pretextual for discriminatory retaliation based on FMLA leave. The decision to terminate was made after Dr. Lucasti, Barbara Kelly and Mr. Quigley all had spoken to C.W. and found him to be credible.

Plaintiff mischaracterizes the record as to comments about FMLA leave. Even if Mr. Quigley once initially refused to let Plaintiff attend an appointment, SMH as an organization let her leave work, and the other comments Quigley made to human resources concerned non-FMLA absences. Moreover, the fact that Quigley made a stray observation, according to Ms. Waugh, that Plaintiff was "absent" does not make it likely that her termination was improper. And although Plaintiff argues that Quigley improperly discussed Plaintiff's absences with Mr. Foley prior to her termination, Foley merely testified that "I believe [Quigley] would have [discussed attendance] because I would have asked about that, and I think we had that discussion, yes," but he could not recall what Quigley said. (Foley Dep. at 31:18-32:23.) The record does not suggest that Quigley improperly discussed FMLA leave with Foley, as Plaintiff suggests. The record contains evidence that Quigley was frustrated with Plaintiff's non-FMLA absences but does not establish a pattern of hostility toward Plaintiff's FMLA leave. That Plaintiff had

numerous unexcused absences does not somehow give rise to an
inference that the employer was antagonistic to FMLA absences
that Plaintiff requested, all of which were approved.

This evidence, and the evidence previously discussed related
to Plaintiff's interference and retaliation claims, is not
sufficient to permit a reasonable jury to disbelieve Defendants'
reasons for termination or to conclude that it was more likely
than not that Plaintiff was terminated in retaliation for taking
FMLA leave. Plaintiff fails to make the requisite showing that
improper retaliation based on taking FMLA leave "was a
determinative factor in the adverse employment decision, that is,
that but for the protected characteristic, the plaintiff" would
not have been fired. Fuentes, 32 F.3d at 764. To avoid summary
judgment Plaintiff's evidence must "allow a factfinder reasonably
to infer that each of the employer's proffered non-discriminatory
reasons . . . was either a post hoc fabrication or otherwise did
not actually motivate the employment action . . . ." Id.
Plaintiff must "demonstrate such weaknesses, implausibilites,
inconsistencies, incoherencies, or contradictions in the
employer's proffered" justification that a reasonable jury could
find them "unworthy of credence." Id. at 765. Plaintiff has not
adduced evidence from which a jury could reasonably find that she
met this "difficult burden" and she also presents insufficient
evidence to link the termination decision to her taking FMLA

leave. Id. Summary judgment will be granted.

**C. Age discrimination under the NJLAD**

The New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12(a), prohibits an employer from terminating an employee because of age or disability, among other things. The New Jersey Supreme Court has adopted the same McDonnell Douglas burden-shifting framework discussed above for age discrimination cases. See Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982).

To establish a claim for age discrimination under the NJLAD, a plaintiff must show that "(1) she was a member of a protected group; (2) her job performance met the 'employer's legitimate expectations'; (3) she was terminated; and (4) the employer replaced, or sought to replace, her" with a "'candidate sufficiently younger to permit an inference of age discrimination.'" Nini v. Mercer Cnty. Cmty. Coll., 406 N.J. Super. 547, 554-55 (App. Div. 2009), aff'd, 202 N.J. 98 (2010); see also Bergen Commercial Bank v. Sisler, 157 N.J. 188, 213 (1999) (stating the fourth element "focuses not on whether the replacement is a member of the protected class but on 'whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground'"); Young v. Hobart W. Grp., 385 N.J. Super. 448, 459 (App. Div. 2005)

43

(clarifying that the "question is not necessarily how old or young the claimant or his replacement was, but whether the claimant's age, in any significant way, 'made a difference' in the treatment he was accorded by his employer'") (quoting Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 82 (App. Div. 2001), certif. denied, 170 N.J. 388 (2001)).[17]

The only element in dispute here is the fourth: whether there is a logical reason to believe that age made a difference in her termination. Plaintiff's evidence of age discrimination consists of comments by Mr. Quigley that she "get with the times," spoken in a joking, if insensitive, manner when she was having trouble learning new software applications; comments that she "move faster"; the fact that Quigley did not make similar comments to others because they were "quite savvy" with the computer; and Quigley's comment that "younger employees have learned the computer system much faster." Plaintiff testified that these comments increased in frequency in January 2011. Plaintiff, who was 51 when she was terminated, emphasizes that she was replaced by an employee more than 10 years younger. (Pl. Opp'n at 37.)

While younger people tend to be more computer literate,

---

[17]    Plaintiff cites older New Jersey Appellate Division cases stating that the fourth element is merely that the employer sought to replace the plaintiff with someone to perform the same work. The Court will follow instead the New Jersey Supreme Court and more recent Appellate Division cases described above.

comments about Plaintiff's computer skills do not render
Plaintiff's termination the likely result of improper age
discrimination. There is no evidence in the record that
Defendants discussed age or her computer skills with Plaintiff
around the time of her termination. Likewise, there are no overt
comments in the record by Defendants that Plaintiff was "too old"
for her job. Plaintiff testified that she took comments about her
computer skills, made jokingly, to be accusations about her age.
There is no dispute that Plaintiff had not gained computer skills
with the same fluency and reliability of her fellow employees,
many of whom were younger. She admitted she was quite likely to
need help with her computer entries on the job. In other words,
Quigley's comments about Ms. Wright's deficient computer skills
were correct criticisms, and not some fabrication or
exaggeration. Plaintiff has not established, nor could a
reasonable jury infer from this record, that Plaintiff's age made
a difference in the decision to terminate her.

For the sake of argument, assuming Plaintiff established a
prima facie case of age discrimination, the record pertaining to
age-related comments certainly is not substantial enough to
overcome her burden to refute the proffered legitimate reason for
her termination. All Plaintiff can muster is Mr. Quigley's
comments, the fact that she was "one of the oldest employees" in
her department when she was fired, that she was replaced by a

younger employee and that Quigley himself was much younger than Plaintiff. This is not enough for a reasonable factfinder to disbelieve that the C.W. incident was the true reason for her termination or to conclude that age was more likely than not the determinative factor in her termination. Summary judgment will be granted on the NJLAD age discrimination claim.

**D. Actual or perceived disability under the NJLAD**

A prima facie case for disability discrimination under the NJLAD requires a showing that (1) Plaintiff was disabled within the meaning of the law, (2) her job performance met the employer's legitimate expectations, (3) she was fired, and (4) the employer sought another to perform the same work. A.D.P. v. ExxonMobil Research & Eng'g Co., 428 N.J. Super. 518, 532 (App. Div. 2012).

Here, the parties dispute whether Plaintiff can establish the first element, which "requires plaintiff to demonstrate that he or she qualifies as an individual with a disability, or who is perceived as having a disability, as that has been defined by statute." Victor v. State, 203 N.J. 383, 410 (2010). The NJLAD's definition of disability is broad[18] and encompasses more than

---

[18]    The statute defines disability as "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness, and which shall include, but not be limited to any degree of . . . lack of physical coordination, . . . or any mental, psychological or developmental disability . . . which . . . is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic

only "'severe' or 'immutable' disabilities." Id. at 410 n.11
(quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 16 (2002)); see
also Andersen, 89 N.J. at 495 (stating that the "statute speaks
in terms of any physical disability" and "should be construed
'with that high degree of liberality which comports with the
preeminent social significance of its purposes and objects.'")
(quoting Passaic Daily News v. Blair, 63 N.J. 474, 484 (1973)).
The statute protects anyone who "is or has been at any time
disabled," N.J.S.A. § 10:5-4.1, as well as those "those perceived
as suffering from a particular handicap . . . as much . . . as
those who are actually handicapped." Rogers v. Campbell Foundry
Co., 185 N.J. Super. 109, 112 (App. Div. 1982), certif. denied,
91 N.J. 529 (1982); see also Cowher v. Carson & Roberts, 425 N.J.
Super. 285, 296-97 (App Div. 2012). If Plaintiff "can demonstrate
that the discrimination that [she] claims to have experienced
would not have occurred but for the perception" that she was
disabled, her "claim is covered by the LAD." Cowher, 425 N.J.
Super. at 297.

Plaintiff argues that she "suffered from a physical
condition that prevented the normal exercise of a bodily
function" and, more specifically, prevented her from "the normal
exercise of walking, sitting, bending, lifting, carrying things
and performing household chores." (Pl. Opp'n at 29.) Plaintiff

techniques." N.J.S.A. § 10:5-5(q).

further contends that she continues to seek treatment for her back and eye conditions and therefore qualifies as disabled under the NJLAD. (Id. at 29-30.)

Plaintiff adduces no medical evidence as to her disability after she returned to work full time. But even assuming Plaintiff was disabled at the time of her termination, or is able to establish a prima facie case on the strength of her having been disabled in the past, Plaintiff fails to meet her burden to establish that the stated reason for her termination was a mere pretext for Defendants' desire to terminate her because of her disability. Plaintiff simply makes no showing that her termination was in any way motivated by her inability to perform "normal exercise of walking, sitting, bending, lifting, carrying things and performing household chores." The record would not permit a reasonable jury to find that Defendants' proffered reason for her termination was unworthy of credence and that, instead, it was motivated by discrimination on the basis of a disability or perceived disability. Defendants are entitled to summary judgment on the NJLAD disability claim.

**E. Retaliation claim under the NJLAD**

To establish a prima facie case of retaliation under the NJLAD, Plaintiff must show that "1) she was engaged in a protected activity known to the defendant; 2) she was thereafter subjected to an adverse employment decision by the defendant; and

3) there was a causal link between the two." <u>Woods-Pirozzi v.</u>
<u>Nabisco Foods</u>, 290 N.J. Super. 252, 274 (App. Div. 1996).

For the reasons explained above, Defendants are entitled to
summary judgment on this claim. Even assuming Plaintiff
establishes a prima facie case of retaliation for taking
protected leave, Plaintiff cannot establish pretext necessary to
survive summary judgment. As the Court explained related to
Plaintiff's arguments of pretext for her FMLA claim, the record
does not contain evidence that would permit a reasonable jury to
find that Plaintiff was fired for taking protected medical leave.
Therefore, Plaintiff fails to meet her evidentiary burden, and
Defendants are entitled to summary judgment.

## VI. Conclusion

For the reasons stated above, Defendants' motion for summary
judgment is granted. An accompanying Order will be entered.


**November 19, 2013**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         Chief U.S. District Judge